UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

JOSE SOTO,

        Plaintiff,

  v.                                              Case No. 07-C-75

PETER ERICKSON, et al.,

        Defendants.

**DECISION AND ORDER**

This case is presently before me on cross motions for summary judgment. Plaintiff Soto was allowed to proceed on claims asserting retaliation and violations of the Eighth Amendment, as well as a First Amendment claim based on the deprivation of newspapers. For the reasons given below, the defendants' motion will be granted and the plaintiff's denied.

**I. Retaliation**

Conduct that does not independently violate the constitution can constitute retaliation if it is done with the improper purpose to punish the plaintiff for engaging in protected activity. *Hoskins v. Lenear,* 395 F.3d 372, 375 (7th Cir. 2005). Plaintiff contends that he filed a grievance against defendant Erickson (the GBCI security director) and that soon after Erickson retaliated against him by exaggerating the plaintiff's involvement a fight in which plaintiff was implicated. Plaintiff states that in early 2003 he swung a "closed right fist" at another inmate, but Erickson, who wanted to get even with the plaintiff, made the fight into an instance of "stabbing" or swinging some kind of sharp

object at the other inmate. Erickson's exaggeration about the fight, Soto asserts, resulted in plaintiff's placement in administrative confinement.

The plaintiff has offered no admissible evidence supporting the truth of his assertion that Erickson somehow exaggerated the nature of the offense in question. The fight in question was written up by an Officer Kamin. He witnessed the fight personally, and saw plaintiff swing a closed fist at inmate Smith. He filed a contemporaneous conduct report and concluded the report by noting that Smith had been cut on his chest and required six stitches. (Erickson Aff., Ex. A at 5.) The report has a blank box entitled "IF WEAPON INVOLVED – WHAT" and Officer Kamin wrote "N / A" in that box, indicating that no weapon was involved. (*Id.*) A subsequent hearing was held and a report was filed by a Lt. Van Gheem, in which he noted that plaintiff was seen hitting Smith with a closed fist and that this was considered "fighting." (*Id.* at 16.) Segregated confinement was ordered as a result of a finding of guilt for fighting as well as the fact that "serious injury" resulted. (*Id.*)

The record shows that plaintiff was involved in a serious fight that resulted in injury. He disputes the nature of the fight, but if he has a dispute it is with the officer who witnessed the fight, Officer Kamin. More importantly, nowhere in the record is there any evidence that plaintiff was disciplined for "stabbing" anyone – the original report stated that there were no weapons involved, and nowhere do any of the defendants suggest that there was a stabbing incident at all. Similarly, even if the cut Smith received played a role in the discipline imposed on plaintiff, there is no indication that defendant Erickson had anything to do with that. As noted, the evidence of Smith's cut came directly from the offender report filed by the officer who witnessed the fight himself. Ultimately, plaintiff's numerous filings indicate that he believes inmate Smith cut *himself* and that

2

plaintiff has been wrongly punished for Smith's own act. But there is no evidence at all that plaintiff was somehow subjected to extra discipline as a result of any retaliatory animus Erickson may have had with respect to him.[1]

Plaintiff also alleges that he was singled-out for punishment for a "fishing" offense. On August 11, 2003, prison staff saw a string between two cells, one of which housed Soto. The string appeared to be from Soto's underwear. Soto was issued a conduct report and as a result he lost 8 days of recreation. Further, pursuant to prison policy, his linens, clothing and sheets were removed and he was put in a paper gown. (Ericksen Aff., ¶ 37.)

Soto argues that Ericksen knew that Soto had been docked 8 days of recreation for the fishing offense – punishment enough, in Soto's view – and thus he views the additional sanctions (the removal of his clothing and bedding and the imposition of a paper gown requirement) as gratuitous punishment explainable only by Ericksen's desire to retaliate. He further notes that his appeal of the restriction was affirmed and that the reviewing officer found the paper gown restriction "incongruent" with an offense that resulted in only an eight-day loss of recreation. (Pltf. Ex. BB.) Even so, that is not evidence of retaliation. The policy of imposing paper gown restrictions on inmates who abused their clothing was implemented long before Soto was written up for "fishing". (Ericksen Aff., Ex. J.) In fact, a memo had circulated in December of the previous year warning inmates that fishing would be subject to a paper gown restriction. (*Id*. at 2.) Absent any evidence that the policy was created in order to retaliate against the plaintiff or that it was not

---

[1]Plaintiff has submitted his own affidavit, in which he states that Officer Brant told him he was believed to have used a shank during the fight in question. (Soto Aff., Ex. 47.) This is hearsay and does not constitute evidence admissible to defeat (or win) summary judgment. Even so, there is nothing remarkable about prison staff believing a weapon was involved when the inmate in question required stitches for a cut.

3

enforced against other inmates, the fact that plaintiff was punished for an offense in a manner expressly contemplated by department policy belies any notion that the action was retaliatory.

Finally, as to both the fishing and fighting incidents, two additional hurdles exist for the plaintiff. First, I am mindful that countless appellate decisions caution district courts against involving themselves in the day-to-day operations of a prison. This is especially true when the claim alleged is retaliation, because it is often the most troublesome inmates who are disciplined, and their discipline often comes soon after some they have filed some grievance or another. In other words, because prisons are rife with potential retaliation claims based only on suspicious timing, such claims must be subject to somewhat more searching scrutiny.

> [W]e agree with the Ninth Circuit that the retaliation inquiry should be undertaken in light of the "general tenor" of *Sandin*, which "specifically expressed its disapproval of excessive judicial involvement in day-to-day prison management." *Pratt v. Rowland,* 65 F.3d 802, 807 (9th Cir. 1995). "[W]e should 'afford appropriate deference and flexibility' to prison officials in the evaluation of proffered legitimate penological reasons for conduct alleged to be retaliatory." *Id.* (citing *Sandin v. Connor,* 515 U.S. 472, 482 (1995)).

*Babcock v. White,* 102 F.3d 267, 275 (7th Cir. 1996).

Normally, the plaintiff in such a case alleges that he was punished based on trumped up charges in order to retaliate for an earlier-filed grievance. Here, however, the plaintiff was actually written up for clearly *legitimate* infractions – one involving a serious fight – by people who had no retaliatory animus whatsoever. Soto's claim is not that he was innocent of the charges but that the punishment imposed was too harsh – an even more speculative assertion. The plaintiff's claim would require the court to probe the inner workings of the prison's disciplinary procedures and parse through what part of the punishment imposed was legitimate and what part was retaliatory – a task that would be impossible even if the plaintiff had some evidence of retaliatory motive. In

4

short, it is precisely the sort of retaliation claim that mandates dismissal absent clear evidence in the plaintiff's favor.

A second problem pervading the retaliation claims is the absence of any actual link between a grievance filed against Ericksen and the conduct alleged to be retaliatory. Throughout his numerous filings the plaintiff quotes an individual who told him his punishment was "personal," as though it was imposed because Ericksen did not like the plaintiff. But that, on its own, is not enough to suggest that the punishment was imposed in retaliation for the plaintiff's protected activity. An officer's general dislike of an inmate is not enough, and nowhere in his briefs does the plaintiff make a compelling case linking a given grievance filed against Ericksen to any retaliatory conduct by Ericksen. Accordingly, for these reasons and those discussed above, the plaintiff's retaliation claims will be dismissed.

Plaintiff also argues that his placement in administrative confinement was a violation of due process or the Eighth Amendment. The due process claim fails because, as noted above, the plaintiff received a hearing; and because there is no evidence supporting the retaliation claim, there is similarly no evidence even suggesting that the process he received was inadequate or rigged. Similarly, the notion that having to wear a paper smock for five days violates the Eighth Amendment is wholly novel. Paper gowns are common in prisons – an unfortunate necessity required by the fact that inmates often abuse their own clothing. As noted earlier, inmates were warned ahead of time that such a restriction would be imposed if they misused their own clothing. The fact that the prison administration later reversed itself does not transform the original imposition of a paper smock into cruel and unusual punishment. In addition to his gown, Soto had a blanket and the temperature in the cell was in the seventies. He makes only minimal assertions

5

that he suffered any discomfort. With no evidence in the record that the brief imposition of a paper gown requirement was cruel or unusual, the claim will be dismissed.[2]

**II. Retaliation by Swiekatowski and Stutleen**

Plaintiff also alleges that defendant Swiekatowski issued a "false conduct report" against him in order to help Ericksen retaliate against the plaintiff. This claim is based on pure speculation and what can only be described as the somewhat grandiose belief that the defendants entertained some nefarious retaliatory animus against the plaintiff throughout his confinement.

First, the plaintiff does not identify what particular protected activity was the genesis of Swiekatowski's desire to retaliate. The "false conduct report" at issue here occurred in 2006, several years after the alleged retaliation described above. Accordingly, because there is no logical connection even alleged between the retaliatory act and any protected activity, the claim fails.

Second, the allegations do not even set forth a plausible retaliatory act. The evidence shows that Swiekatowski found several gang-related communications in Soto's possession and wrote Soto up for that offense. (Swiekatowski Aff., ¶ 4.) The punishment was imposed by a Lieutenant Lezats, not Ericksen or Swiekatowski. After a hearing and appeal, the discipline was reversed because the reviewer found that the letters, etc., in Soto's possession were part of a criminal case that was apparently pending at the time. The fact that the offense was later expunged does not somehow mean that the conduct report was "false" or retaliatory. In fact, it would be surprising if an inmate were not reported for having gang-related paraphernalia in his cell.

---

[2] Similarly, the plaintiff's substantive due process is not an appropriate analysis when the Eighth Amendment would clearly apply. *County of Sacramento v. Lewis,* 523 U.S. 833, 843 (1998).

6

Soto makes another retaliation claim against defendant Mark Stutleen, who he alleges falsely wrote him up in 2006 for "lying." Again, the connection between Stutleen, Ericksen, and any protected activity on Soto's part is purely speculative – fundamentally, it is unclear how a behavior report written in 2006 was supposed to be retaliatory for some unspecified complaint Soto had filed against Ericksen years earlier. Moreover, the claim, as with the claim against Swiekatowski, does not even state a plausible retaliatory act. The event in question occurred as a result of action Soto himself initiated – seeking legal materials – and Stutleen believed Soto had lied about who had told him where such materials could be found. (Stutleen Aff., ¶ 5.) The later expungement of the report does not suggest that it was retaliatory; it merely suggests that a reviewing officer did not believe the punishment imposed was warranted. Presumably Ericksen, as the prison's security director, could have done a much better job retaliating against the plaintiff if he had truly desired to do so. Without any evidence supporting these claims, both will be dismissed.

**III. First Amendment – Newspapers**

In July 2003, prison staff conducted a review of Soto's confinement – he had been in various steps of segregation status as a result of the fighting incident described above – and determined he should be placed in administrative confinement. The decision was based on Captain Brant's review, and was motivated in part by Soto's fighting offense, as well as prior gang activity and other incidents. (DPFOF ¶¶ 26-34.)

In administrative confinement inmates are allowed a number of personal items, but newspapers are forbidden. The defendants have explained this policy as being based in institutional safety:

7

> Inmates on segregation status or on administrative confinement status housed in the segregation unit are not allowed newspapers because the newspapers can be used to cover their cell windows, cell cameras, used to obstruct the plumbing, start fires, obstruct the traps in the doors, etc. violated the rules of the DOC 303 and might otherwise engage in activities that threaten the safety and security of the institution.

(Ericksen Aff. at ¶ 29; Bertrand Aff. at ¶ 30.)

The Supreme Court addressed a similar policy in *Beard v. Banks*. There, the prison disallowed newspapers, photos and magazines to inmates placed in long-term segregation, and the court found the policy constitutionally acceptable.

> The Secretary in his motion set forth several justifications for the prison's policy, including the need to motivate better behavior on the part of particularly difficult prisoners, the need to minimize the amount of property they control in their cells, and the need to assure prison safety, by, for example, diminishing the amount of material a prisoner might use to start a cell fire. We need go no further than the first justification, that of providing increased incentives for better prison behavior.

*Beard v. Banks,* 548 U.S. 521, 126 S.Ct. 2572, 2578 (2006). In finding the policy acceptable, the court applied the analysis of *Turner v. Safley*, 482 U.S. 78, 87 (1987), which holds that restrictive prison regulations are permissible if they are "reasonably related to legitimate penological interests." *Turner* set forth a four-part test, which is intended to afford substantial deference to the decisions made by those running state prison systems.[3] It is not, in other words, an invitation for judges to

---

[3]The court summarized *Turner*'s factors as follows:

First, is there a " 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it"? Second, are there "alternative means of exercising the right that remain open to prison inmates"? Third, what "impact" will "accommodation of the asserted constitutional right ... have on guards and other inmates, and on the allocation of prison resources generally"? And, fourth, are "ready alternatives" for furthering the governmental interest available?

126 S.Ct. at 2578 (citing *Turner,* 482 U.S. at 89).

8

reevaluate such rules based on their own subjective (and likely uninformed) views about prison management.

In *Beard,* the court found the policy reasonable. In doing so, the court was motivated by the rationale provided by the deputy superintendent of the prison, who stated that the policy was necessary to achieve improvements in inmate behavior. The ultimate question, however, was whether the policy was not merely logical, but reasonable. The court proceeded to analyze the policy under *Turner*'s other factors but concluded that those factors "add little . . . to the first factor's basic logical rationale." *Id.* at 2580.

Here, the prison's stated reasons are arguably even stronger than the reason the court considered in *Beard*. Because the defendants' stated reasons are based on institutional security – rather than the more abstract goal of ameliorating inmate behavior – the defendants' rationale is arguably more susceptible to judicial analysis to determine that there is a reasonable relation between the rule and the penological interest at stake. It is clear that the rule is justifiable under *Turner* and *Beard*. First, the connection between safety and the prison's restrictions on items that can be used to start fires or cover security cameras is obvious. As the Western District court noted in another case:

> Inmates in segregation are not allowed to possess publications such as magazines or newspapers because they misuse them in a number of ways. In the past, inmates have used them to plug toilets, which causes water to flow out of an inmate's cell and onto the range, requiring temporary movement of the inmate and any other inmate who may have water in his cell as a result of the plugged toilet to other cells that are dry. The property of the inmates whose cells are flooding may be damaged. Also, inmates may use pages from newspapers and magazines to cover the windows on their cell doors, preventing staff from seeing whether they are harming themselves or attempting suicide. In addition, inmates have used magazines and

9

> newspapers to make papier-mâché weapons. Institution staff have retrieved several papier-mâché weapons that would inflict severe injuries if used on staff or other inmates.

*King v. Frank,* 371 F. Supp. 2d 977, 980 (W.D. Wis. 2005). Similarly, it is clear that there is no reasonable alternative to banning newspapers when the issue is safety and security – it is not so much a matter of censorship of information as it is a denial of physical property. It is the property itself that is dangerous, not the content. As to the second *Turner* factor, it is true that inmates in segregation will have no alternative means to exercise their limited right to read newspapers, but the court in *Beard* found that only marginally important. 126 S.Ct. at 2579-80. Moreover, it is equally true that the third *Turner* factor could adversely impact the ability of prison guards to ensure the safety of inmates in segregation. Ultimately, both *Turner* and *Beard* compel the conclusion that the prison's ban on newspapers for inmates in segregation is constitutionally acceptable.

Soto protests that he personally has no history of using newspapers in a dangerous fashion, but that misses the point. First, as his own record demonstrates, he has engaged in improper activities including "fishing," which involves the transfer of property between inmates. The prison may reasonably ban newspapers or certain other property from an entire section of a prison so that the contraband does not get into the wrong hands. Second, it is not incumbent on the prison to take the risk that the plaintiff will continue to use newspapers in an acceptable fashion. The prison has determined that Soto was sufficiently dangerous to justify segregated confinement, and it need not subject guards and other inmates to the chance that Soto could misuse newspapers and flood his cell, cover up a camera, or make a weapon. Moreover, the very placement in segregation may incite an inmate to take actions he might not have taken earlier. Finally, the newspaper restriction is part-and-parcel of the prison's segregated confinement standards. Soto's premise is that even if the

prison has grounds to place an inmate in segregation, it must undertake a detailed inmate-by-inmate analysis of the restrictions at issue to "customize" the conditions of confinement to a given inmate. That is simply not a viable premise. Accordingly, the First Amendment claim based on newspaper restrictions will be dismissed as well.[4]

IV. Conclusion

For the reasons stated above, the plaintiff's motion for summary judgment is **DENIED** and the defendants' is **GRANTED**. The plaintiff's other pending motions are also **DENIED**. The case is **DISMISSED**.

**SO ORDERED** this ___9th___ day of May, 2008.

                                                s/ William C. Griesbach
                                                William C. Griesbach
                                                United States District Judge

---

[4]The plaintiff also has two other pending motions, and both of those will be denied as well. I find no basis upon which to reconsider my October 3, 2007 decision denying Soto relief. Similarly, there is no basis for granting injunctive relief relating to access to legal materials. The plaintiff was more than able to present his case adequately.

11